# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-60043

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2018

Lyle W. Cayce
Clerk

ROBERT L. JENKINS,

      Petitioner - Appellant

v.

PELICIA HALL, COMMISSIONER, MISSISSIPPI DEPARTMENT OF
CORRECTIONS; RON KING, Superintendent, Central Mississippi
Correctional Facility,

      Respondents - Appellees

Appeal from the United States District Court
for the Southern District of Mississippi

Before REAVLEY, ELROD, and HIGGINSON, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

Robert L. Jenkins appeals the district court's denial of his 28 U.S.C.
§ 2254 petition for writ of habeas corpus. The State of Mississippi indicted
Jenkins for possessing a substance weighing more than 0.1 gram but less than
2 grams and containing a detectable amount of cocaine. The laboratory analyst
who determined the weight and identity of the substance (Alison Smith) was
unavailable to testify at trial, so her manager and technical reviewer (Timothy
Gross) testified about the test results. Jenkins objected that he had a Sixth
Amendment right to confront Smith. The trial court overruled his objection,

No. 17-60043

and Jenkins was convicted by a jury. Pursuant to Mississippi's habitual offender statute, Jenkins was sentenced to life imprisonment without the possibility of parole. After exhausting his state court remedies, Jenkins filed a § 2254 petition, which the district court denied.  We affirm.

## **BACKGROUND**[1]

### I.    **Arrest and Evidence Seizure**

On January 27, 2007, close to midnight, a state police officer named Michael Brennan observed Jenkins staggering as he walked along a roadway in Biloxi, Mississippi. Officer Brennan stopped Jenkins to check his sobriety and detected a slur in his speech, the odor of alcoholic beverages on his breath, watery and bloodshot eyes, and that his balance was unsteady. When Officer Brennan attempted to take Jenkins into custody for public intoxication, he noticed a white tissue in Jenkins's mouth. Officer Brennan ordered Jenkins to remove the tissue and Jenkins complied, placing it on the hood of the patrol car. At that point, a white, rock-like substance rolled out of the tissue. Jenkins grabbed the rock, threw it in his mouth, and swallowed it. When Officer Brennan checked Jenkins's mouth, it was no longer there. But Officer Brennan discovered two more rocks in the tissue.

Officer Brennan placed those rocks into an evidence bag. He heat-sealed the bag and wrote the date, his initials, and the case number on it. Later that night, he placed the bag into a vault that is accessible only to narcotics investigators.

### II.   **Crime Lab Examination**

Approximately three months later, the Mississippi Crime Laboratory (the "Crime Lab") examined the rocks. The Crime Lab Report (the "Report")

---

[1] The following narrative traces testimony offered by the State at trial because Jenkins presented no affirmative case. Except where indicated, none of these facts is disputed.

listed the specific tests performed as: "Chemical Test" and "Gas Chromatography/Mass Spectrometry." The Report concluded that the bag contained "Cocaine, Amount: 0.1 Gram." It was certified and signed by both Alison Smith as "Case Analyst" and Timothy Gross as "Technical Reviewer."

Smith is also known as a "technician." Her job is to visually examine evidence, weigh it, obtain a sample of it, and then subject that sample to chemical tests.

Gross is Smith's manager. He oversees the general operations of the Crime Lab and serves as technical and administrative reviewer on some cases. As a technical reviewer, it is Gross's job to review the data in a case file to ensure that it supports the analyst's conclusion on the report. The administrative review assesses the accuracy of basic information like dates and initials and whether proper procedures were followed. Gross was the technical and administrative reviewer in Jenkins's case. In that capacity, he did not observe or participate in Smith's testing of the substance, but he did review the data that Smith placed on her worksheet and the mass spectrometry data in the case file in order to ensure that they supported her conclusions in the Report.[2]

As mentioned above, Smith performed two tests to determine the substance's identity: a "Chemical Test" and a "Gas Chromatography/Mass Spectrometry." The chemical test was a "cobalt thiocyanate test," which involves placing a small amount of the sample in a test tube with cobalt thiocyanate solution to observe color change. The "Gas Chromatography/Mass Spectrometry" is used to separate different components in a sample.

---

[2] Smith's worksheet is not in the record, nor is any of the raw data that the case file contained.

No. 17-60043

After the Report was issued, a Mississippi grand jury indicted Jenkins for possession of a controlled substance and the case proceeded to trial.

## III.   Jury Trial

At the time of trial, Smith was unavailable due to extended medical leave. Accordingly, the State called Gross to testify about the results of the Crime Lab examination. Jenkins objected. Outside the presence of the jury, the trial court heard Gross's testimony and then ruled: "[I]n light of [the] fact that Mr. Gross participated in the analysis of the subject testing in the capacity as technical reviewer[, his testimony] does not violate the defendant's 6th Amendment right, and as such the objection is overruled and the witness will be able to testify in an expert capacity as to the results of the crime lab."

During trial, the court admitted Gross to testify as an expert in "narcotics analysis." He began his testimony by describing his duties at the Crime Lab. Then he presented chain-of-custody evidence, noting Smith's initials on the evidence bag. Next, Gross explained the examinations that were performed: the cobalt thiocyanate test and the gas chromatography/mass spectrometry. He did not explain how the weight of the substance was determined. When asked whether there was "any data generated from Ms. Smith's analysis," Gross answered, "Yes." The State then asked Gross to identify "State's Exhibit Number 5" (the Report) and Gross did so, describing it as "a report that was issued [in this case]" that "states the results of the analysis." The following exchange then occurred between the prosecutor and Gross:

> **Q.** And in this case the results of analysis are what, Mr. Gross?
> **A.** The results of the analysis were th[at] evidence submission number one contained cocaine in the amount of 0.1 gram.

4

No. 17-60043

**Q.** So the total weight is 0.1 gram; is that correct?
**A.** Yes.

The prosecutor concluded direct examination by asking whether, in Gross's review, there was "any indication that anything was wrong," to which Gross responded, "No."

Jenkins's cross-examination focused only on the possibility that "the amount of cocaine in th[e] substance could [have been] less than .1 gram[]," even if the weight of the entire mixture had been 0.1 gram.[3] Jenkins's trial counsel never attempted to cross-examine Gross about how the substance was weighed.

The jury found Jenkins guilty. At sentencing, the trial court adjudicated him a habitual offender pursuant to Miss. Code Ann. § 99-19-83 and sentenced him to life imprisonment without the possibility of parole. Jenkins appealed, arguing that the trial court violated the Confrontation Clause by allowing Gross to testify in place of Smith.

The Mississippi Court of Appeals affirmed, *Jenkins v. State*, 102 So. 3d 273, 276 (Miss. Ct. App. 2011), as did a divided Mississippi Supreme Court, *Jenkins v. State*, 102 So. 3d 1063, 1064 (Miss. 2012), *as modified on denial of reh'g* (Dec. 20, 2012). Having exhausted his state court remedies, Jenkins filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Mississippi. On habeas, Jenkins urged that the Mississippi Supreme Court's decision in his case was

---

[3] That inquiry was misguided. The statute under which Jenkins was convicted provides: "The weight set forth refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." Miss. Code. Ann. § 41–29–139(c). Therefore, as long as the "mixture or substance" weighed at least 0.1 gram, and cocaine was detectable therein, the weight of actual cocaine within the 0.1 gram substance is irrelevant.

No. 17-60043

contrary to, or involved an unreasonable application of, *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).

While Jenkins's petition was pending in the district court, the Fifth Circuit decided *Grim v. Fisher*, 816 F.3d 296 (5th Cir. 2016). *Grim* applied *Bullcoming* to a case in which a crime laboratory supervisor, rather than an analyst, testified at trial, and held that such testimony did not violate clearly established law. *Id.* at 301, 310–11. Following supplemental briefing, the district court concluded that *Grim* barred Jenkins from habeas relief. Jenkins appealed to this court. We affirm.

## STANDARD OF REVIEW

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Lewis v. Thaler*, 701 F.3d 783, 787 (5th Cir. 2012) (quoting *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004)).

Under the Antiterrorism and Effective Death Penalty Act of 1996, "a federal court may grant a state prisoner's application for a writ of habeas corpus if the state-court adjudication pursuant to which the prisoner is held 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Howes v. Fields*, 565 U.S. 499, 505 (2012) (quoting 28 U.S.C. § 2254(d)(1)).

"[A] state court decision is contrary to . . . clearly established [federal law] if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Lockyer v.*

6

*Andrade*, 538 U.S. 63, 73 (2003) (internal quotation marks omitted). "It is an unreasonable application of Supreme Court precedent 'if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Salts v. Epps*, 676 F.3d 468, 473–74 (5th Cir. 2012) (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000)).

To obtain habeas relief under § 2254, "a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. 415, 419–20 (2014) (quotation omitted). "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

## ANALYSIS

Jenkins argues that his case is materially indistinguishable from *Bullcoming v. New Mexico*, and that the Mississippi Supreme Court's decision rejecting Jenkins's Sixth Amendment claim is contrary to, or an unreasonable application of, that clearly established federal law. He acknowledges that *Grim v. Fisher* addressed a similar issue but argues either that his case is distinguishable from *Grim* or that *Grim* was wrongly decided.

*Bullcoming* involved the crime of "driving a vehicle while 'under the influence of intoxicating liquor' ("DWI")." 564 U.S. at 652 (quoting N.M. Stat. Ann. § 66–8–102 (2004)). When Bullcoming was arrested, he "refused to take a breath test, [so] the police obtained a warrant authorizing a blood alcohol analysis." *Id.* Pursuant to the warrant, his blood was drawn and the sample was sent to a crime laboratory for gas chromatography analysis. *Id.* at 652, 654. The lab produced a report stating that Bullcoming's blood alcohol

concentration ("BAC") was 0.21, which was sufficiently high to prosecute him for an aggravated DWI. *Id.* at 655.

Bullcoming's case proceeded to a jury trial. *Id.* On the first day of trial, the State announced that it would not call Curtis Caylor, the forensic analyst who had tested the blood sample, because he had been put on leave for an unexplained reason. *Id.* at 653, 655. Instead, the State would introduce the lab report through Gerasimos Razatos, a "scientist who had neither observed nor reviewed Caylor's analysis," but who "qualified as an expert witness with respect to the gas chromatograph machine" and "was available for cross-examination regarding the operation of the . . . machine, the results of [Bullcoming's] BAC test, and the [lab's] established laboratory procedures." *Id.* at 655–57. Defense counsel objected under the Confrontation Clause. *Id.* at 655–56. The trial court overruled the objection, the jury convicted Bullcoming, and the New Mexico Supreme Court affirmed. *Id.* at 656–57. Bullcoming filed a direct appeal to the United States Supreme Court, which reversed his conviction.

The scope of the *Bullcoming* holding is a question that has roiled federal courts. *See, e.g.*, *Grim*, 816 F.3d at 309 (noting "[w]idespread disagreement among courts regarding *Bullcoming*"). In the introduction to *Bullcoming*, the Court described the "question presented" as "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist *who did not sign* the certification or perform or observe the test reported in the certification." 564 U.S. at 652 (emphasis added). The Court answered that question in the negative and explained, "The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial,

and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.* As Justice Sotomayor noted in her concurrence, *Bullcoming* was "not a case in which the person testifying [was] a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 672.[4] Razatos had "no involvement whatsoever in the relevant test and report." *Id.* at 673. As described above, that is not the context here, nor was it the context in *Grim*.[5]

*Grim* presented a set of facts remarkably similar to the instant case. Frederick Dennell Grim was convicted in Mississippi state court of selling cocaine and sentenced as a habitual offender to life imprisonment without parole. 816 F.3d at 299. The trial judge permitted Erik Frazure, "a technical reviewer who had neither observed nor participated in the testing of the substance," to testify about the results of the controlled substance analysis. *Id.* Gary Fernandez, "the analyst who performed the testing and generated the report . . . did not testify." *Id.* Grim objected under the Confrontation Clause that Frazure's review of Fernandez's "work packet and report" supplied an insufficient basis for confrontation. *Id.* at 299-300. The trial court overruled the objection, concluding that "Frazure had enough dealings with the technical review of the cocaine to be allowed to testify." *Id.* at 299–300. Grim appealed his conviction through the state courts and eventually, on habeas, to the Fifth Circuit. Like Jenkins, he argued that the Mississippi Supreme Court's affirmance of his conviction violated *Bullcoming. Id.* at 302.

---

[4] We do not suggest that Justice Sotomayor's concurrence constitutes clearly established law. *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (reminding that the phrase "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of [United States Supreme Court] decisions" (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))).

[5] It is incumbent on trial lawyers, alert to this issue, to clarify the level of involvement and the precise data that a testifying scientist reviews.

No. 17-60043

Our opinion in *Grim* began by interpreting the bounds of what *Bullcoming* clearly established:

> In *Bullcoming* the Court did not clearly establish the categorical rule . . . that when the prosecution introduces a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—the *only* witness whose in-court testimony can satisfy the Confrontation Clause is the analyst who performed the underlying analyses contained in the report.
> . . .
> [A]t most, the holding of *Bullcoming* clearly establishes that, when one scientist or analyst performs a test reported in a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—and the prosecution introduces the report and certification to prove that particular fact, the Confrontation Clause forbids the prosecution from proving that particular fact through the in-court testimony of a scientist or analyst who neither signed the certification nor performed or observed the test reported in the certification.

*Id.* at 307. *Grim* then applied the holding of *Bullcoming* to its own facts:

> In the present case, Frazure examined the analyst's report and all of the data, including everything the analyst did to the item of evidence; ensured that the analyst did the proper tests and that the analyst's interpretation of the test results was correct; ensured that the results coincided with the conclusion in the report; agreed with a reasonable degree of scientific certainty with the examinations and results of the report; and signed the report. Grim cannot [show that he is entitled to habeas relief] because *Bullcoming* does not address this issue, i.e., it does not address the degree of involvement that Frazure had.

*Id.* at 310. The court held, accordingly, that Grim had not shown a violation of clearly established law. *Id.* The same logic applies here because Gross had the same responsibilities as Frazure including, notably, enough first-hand involvement that he signed the Report.

Jenkins attempts to distinguish his case from *Grim* by urging that Gross could not have offered a genuine analytical opinion with respect to the substance's weight because "Smith's weighing of the substance did not generate any data to review." That argument asks this court to discredit Gross's testimony that, "*based on* [his] review of Ms. Smith's analysis," he concluded "that the exhibit was weighed at 0.1 gram at least." Our review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Because Smith's worksheet is not in the record, we cannot know what data Gross used to form his conclusion about the substance's weight. We note that none of the state courts to examine this case made a finding that no weight data existed for Gross to review. *See Jenkins v. State*, 102 So. 3d 1063, 1064–65 (Miss. 2012), *as modified on denial of reh'g* (Dec. 20, 2012) ("Gross reviewed all of the data submitted and the report generated by Smith to ensure that the data supported the conclusions contained in Smith's laboratory report."); *Jenkins v. State*, 102 So. 3d 273, 278 (Miss. Ct. App. 2011) (noting that Gross's conclusion was "based on his review of the data contained in the file"); Transcript of Trial at 214, Robert L. Jenkins v. State of Mississippi, 2010-KA-00203 (finding that Gross "did verify the results"). At this stage of review, without Smith's worksheet in the record, we decline to find as a fact that no raw data existed to support Gross's conclusion about the substance's weight.

Moreover, as *Grim* observed, and as still holds true, the law does not clearly establish what is required of a testifying analyst with a closer connection to substance examinations than the analyst had in *Bullcoming*. Indeed, this uncertainty has been noted by United States Supreme Court Justices on multiple occasions. *See, e.g.*, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 335 (2009) (Kennedy, J., dissenting) ("Today's decision demonstrates that even in

the narrow category of scientific tests that identify a drug, the Court cannot define with any clarity who the analyst [that must be confronted] is."); *Williams v. Illinois*, 567 U.S. 50, 141 (2012) (Kagan, J., dissenting) ("What comes out of four Justices' desire to limit *Melendez–Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what."); *Stuart v. Alabama*, 139 S. Ct. 36, 37 (2018) (Gorsuch, J., dissenting from the denial of certiorari) ("Respectfully, I believe we owe lower courts struggling to abide our holdings more clarity than we have afforded them in this area.").

Therefore, we cannot say that the Mississippi Supreme Court's decision was contrary to or an unreasonable application of clearly established law. The district court's judgment is AFFIRMED.